IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT PELECH,                    )
                                  )
            Plaintiff,            )
                                  )   No. 14 C 7021
vs.                               )
                                  )   Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Robert Pelech has filed a motion seeking reversal and remand of the final determination of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") (doc. # 11: "Pl.'s Mem."). The Commissioner has responded with its own motion seeking affirmance of the decision (doc. # 18: "Def.'s Mem."). For the following reasons, the Court grants Mr. Pelech's motion and denies the Commissioner's motion.

### I.

We begin with the procedural history of this case. Mr. Pelech filed for DIB on July 6, 2011, alleging that he became unable to work on August 5, 2010 (R. 21). His application was denied initially on January 31, 2012, and again upon reconsideration on May 18, 2012 (*Id.*). Mr. Pelech then requested, and was granted, a hearing before an Administrative Law Judge ("ALJ"), and a hearing took place on February 15, 2013 (R. 35-92). The ALJ issued an opinion denying benefits on March 25, 2013 (R. 21-30). The Appeals Council then denied Mr. Pelech's request

---

[1]On September 19, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 6).

for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A briefly sets forth Mr. Pelech's background, followed by his medical record in Part B. Part C discusses the hearing testimony, and Part D sets forth the ALJ's written opinion.

### A.

Mr. Pelech was born on July 9, 1963, and was 49 years old at the time of the hearing (R. 43). He has never been married (R. 41). He graduated from high school and then went to machinist school, after which time he worked as an iron worker (R. 43). In 2002, Mr. Pelech injured his right hand on the job. In 2007, Mr. Pelech injured his right ankle on the job. In 2010, he severely injured his right kneecap. Mr. Pelech has been unemployed since his third injury, and he suffers from pain in his right hand, ankle, and knee, as well as from asthma.

### B.

The medical record is most significant for three separate injuries. The first event, involving an injury to Mr. Pelech's right hand, occurred around 2002, and there are no medical records in the file documenting original treatment for it. However, Mr. Pelech informed Dr. Mahesh Shah, M.D., who examined Mr. Pelech for purposes of his DIB claim on January 4, 2012, that he hurt his right hand on the job while holding a hand drill, and that x-rays and an MRI taken at that time revealed a fracture of the fifth metacarpal (R. 366). Mr. Pelech subsequently had open reduction, internal fixation ("ORIF") surgery at Northwestern Hospital and currently has "a bony deformity" on that hand (*Id.*).

Mr. Pelech's next injury occurred in August 2007, when he fell off an iron beam at his work place and fractured his right ankle (R. 366).

Mr. Pelech's third injury occurred on August 31, 2010, when he fell off a porch onto his right knee (R. 296).[2] X-rays and a CT scan revealed a tibial plateau fracture that required ORIF surgery to repair (R. 296, 341). Mr. Pelech had surgery on September 17, 2010 at Stroger Hospital (R. 341), and then received followed-up care at Stroger on a monthly basis (R. 346-48, 357).

In November 2010, Mr. Pelech had an image taken of his right knee that revealed "significant degenerative changes in the talocalcaneal joint as well as in the posterior aspect of the talotibial joint" (R. 359). In January 2011, Mr. Pelech had an appointment at Stroger with Jay Kalawadia, M.D., at which time he complained that one of the screws in his knee was causing pain (R. 357). Dr. Kalawadia told him that he could return to the clinic if the screw continued to bother him (*Id.*). Otherwise, Dr. Kalawadia noted that Mr. Pelech "has been walking around just fine, going up and downstairs without difficulty. He notes some occasional morning stiffness" that he resolved with gentle range of motion exercises (*Id.*).

On March 14, 2011, Mr. Pelech had an appointment with Timothy Brandt, M.D., but the notes from this appointment (and other visits as well) are illegible (R. 397). In his brief, Mr. Pelech suggests that the notes from this visit indicate a decreased range of motion of his right ankle, and that two other medical notations from January and June 2012 indicate the same thing (Pl.'s Mem. at 5; R. 397, 399).

---

[2]The record is inconsistent as to the event that caused the knee injury. Mr. Pelech informed medical personnel on the day of the injury that he fell off a porch (R. 296). Mr. Pelech told medical personnel two years later that he hurt his knee in a motorcycle accident (R. 417). Elsewhere in the medical record, Mr. Pelech stated that he hurt his knee falling off a bicycle while holding on to a truck that was traveling at 40 m.p.h. (R. 352).

3

On January 4, 2012, Mr. Pelech underwent an internal medicine consultative examination with Mahesh Shah, M.D., at the request of the Social Security Administration (R. 366-70). During the examination, Mr. Pelech complained of pain in his right knee, right ankle, and right hand, and stated that he could not stand or walk for very long or do any strenuous work (R. 367). Dr. Shah noted that Mr. Pelech entered the examination using a cane and that he walked with a limp, but that he could walk slowly without the cane and was able to get up from a chair and on and off the examining table (*Id.*). Mr. Pelech also was able to go from sitting to lying down and back again without any trouble (*Id.*). Dr. Shah noted a "bony deformity" on Mr. Pelech's right hand, as well as numbness and an inability to fully flex the fifth finger (R. 368-69). He had full range of motion of the right knee but lacked range of motion in his right ankle (R. 369). Mr. Pelech was unable to heel-walk, toe-walk, or squat down (*Id.*).

On January 30, 2012, Dr. Young-Ja Kim, a non-examining state agency reviewer, completed a Physical Residual Capacity Assessment of Mr. Pelech's residual functionality (R. 373-81). Dr. Kim opined that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, and stand, walk, and sit, each, for 6 hours in an 8 hour workday (R. 374). Mr. Pelech could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, or balance (R. 375). He was limited to only occasional pushing and pulling with his lower extremities and limited to "frequent" fingering and feeling in his right hand (R. 375-76).

On May 17, 2012, another non-examining, state agency reviewer, Dr. Richard Bilinsky, completed a physical residual functional capacity assessment ("RFC"). He limited Mr. Pelech to lifting and carrying 20 pounds occasionally, 10 pounds frequently, and standing, walking, and sitting, each, for 6 hours in an 8 hour workday (R. 386). He also found Mr. Pelech limited with respect to pushing or pushing with his lower right extremity (*Id.*). He opined that Mr. Pelech

4

could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; only occasionally stoop and crouch; and frequently kneel and crawl (R. 387).

On June 18, 2012, Dr. Thomas Brandt completed a physical residual functional capacity questionnaire on Mr. Pelech's behalf (R. 393-95). He noted that Mr. Pelech continued to experience pain, weakness, and decreased range of motion in his knee and ankle, and difficulty ambulating (R. 393). He noted that Mr. Pelech could not walk a city block without rest or severe pain and could only sit or stand, each, for about 15 minutes before needing to switch positions (R. 394). As such, Dr. Brandt opined that Mr. Pelech would need a job that allowed him to shift positions at will from sitting, standing or walking; that limited him to sitting, standing, or walking a total of two hours in eight hour workday; and that would allow him to take unscheduled breaks every 90 minutes for five minutes at a time (*Id.*). He opined that Mr. Pelech's leg should be elevated; that he was likely to have "good" and "bad" days; that pain would interfere with his attention and concentration "constantly;" that he would likely be absent more than four days per month; and that he could only rarely lift more than 10 pounds (R. 394-95). He found no significant limitations with respect to reaching, handling, or fingering (R. 395).

In September 2012, Mr. Pelech presented to the emergency room of Stroger Hospital on two occasions complaining of pain in his right leg and active wheezing (R. 417, 421). He complained of right knee pain caused by the screws placed during his ORIF surgery (R. 417). An x-ray of his right ankle revealed a deformity of the distal fibula due to the old, healed, fracture and a small calcaneal spur (R. 406). An x-ray of his right knee indicated a deformity of the proximal tibia laterally due to the old healed fracture and small spurs on the surface of the patella (R. 411). On September 19, 2012, Mr. Pelech underwent surgery to remove the hardware in his right tibia (R. 469, 471). Following the surgery, Mr. Pelech continued to report stiffness in

5

his knee. His range of motion remained decreased (15-90 degrees), but he had normal strength and intact sensation to light touch (R. 465).

On September 26, 2012, Mr. Pelech was seen at Stroger for evaluation of his asthma. Mr. Pelech stated that he has had asthma since childhood and that he has been smoking a half a pack of cigarettes a day for the past six years (R. 456). He was given breathing treatments and medications and discharged (R. 457). Mr. Pelech also reported decreased leg pain since his latest operation, and he was noted to be ambulating and bearing weight on his leg (R. 456).

Mr. Pelech attended physical therapy for his right ankle and knee on January 8, 2013 (R. 460). He reported pain, numbness in both his knee and ankle, and constant pain in his right hand (*Id.*). The therapist noted that Mr. Pelech was able to ambulate independently (*Id.*). Mr. Pelech complained of difficulty dressing, performing housework, walking, bathing, maneuvering stairs, lifting, grooming, and sleeping (*Id.*). Examination of the right knee and ankle revealed they operated within functional limits except for a "painful endrange" of the right knee and some right ankle limited mobility (*Id.*). Mr. Pelech had two other scheduled physical therapy appointments, which he missed (R. 463-64).

### C.

On February 15, 2013, the ALJ conducted a hearing at which Mr. Pelech, his attorney, Mr. Pelech's girlfriend, and a Vocational Expert ("VE") were present (R. 35-92). Mr. Pelech testified first. He stated that he has not worked since August 5, 2010 because of pain in his ankle, knee and hand (R. 44). Mr. Pelech testified that his ankle is a problem for him because it is fused flat, tingles, and is always painful (R. 47, 68). Mr. Pelech stated that he could stand on his right ankle for only five minutes before he needs to shift his weight to the left leg and then sit down (R. 48).

6

As for his hand, Mr. Pelech stated that he broke it ten years ago, and that it has screws in it from the surgery performed to repair it (R. 49, 65). He was able to continue working after the injury, but was unable to do certain tasks such as pulling up bolts (R. 66). Mr. Pelech stated that his hand is getting worse, the bump on it is getting bigger, he is unable to work with it, he can barely write his name, and he cannot tie his shoes (R. 49-50, 67). Mr. Pelech said that his hand always hurts and the smallest two fingers shake all the time (R. 67-68).

Regarding his knee, Mr. Pelech stated that he injured himself when he was riding his bicycle and hit a curb, resulting in a very bad break in five different places (R. 52-53). Mr. Pelech explained that surgeons inserted a plate and screws into his tibia, but that this prevented him from straightening his leg (R. 54). He had the hardware removed in a separate surgery and then experienced "the worst pain in my entire life" (R. 56). He was given medication for the pain, but he does not take it (R. 57-58). Mr. Pelech stated that he did not have insurance until recently, so he has been unable to pursue medical care to the extent he would have liked (R. 60). After his second surgery, Mr. Pelech began to experience numbness all the way from the calf to the knee (R. 69).

Mr. Pelech arrived at the hearing with a cane, which he started using after his ankle fusion (R. 71). He does not use it every day, but uses it when he takes a walk at the mall, for instance (*Id.*). He holds the cane with his right hand, however, and his right hand "can't take the cane" (R. 72). Up to the time of the second surgery, he believes he could have walked the length of a football field (*Id.*). Since the second surgery, his need for his cane has increased (R. 72-73). His right hand injury limits how long he can hold his cane, however, and after about 10 minutes his hand starts to hurt (R. 73).

Mr. Pelech indicated that he has had asthma since he was a baby (R. 61). Most recently, he has been treated at Stroger Hospital for this condition and has been given steroids (R. 61). Mr. Pelech stated that smokes 10 cigarettes a day (R. 84).

Finally, Mr. Pelech testified regarding the activities of daily living he struggles with on account of his injuries. On a typical day, he watches televisions, "toddles" around the house, and rests on his side (R. 65). He used to help his brother, who has multiple sclerosis, but has been unable to do so since he broke his knee (R. 63-64).

Lori Andrak, Mr. Pelech's girlfriend, testified next. She stated that she has lived with Mr. Pelech for two years (R. 76). She testified that Mr. Pelech's leg "gives out on him," that he suffers numbness and pain in his leg, and that his hand "bothers him very, very badly all the time" (R. 78). She noted that he compensates for his hand injury by not using his right hand (*Id.*). She can tell he is in pain on his right side by the way he walks and the look on his face; further, he is short-tempered and forgetful and sleeps poorly (*Id.*). He does not tie or untie his shoes but just slips them on, and he does not zip his jacket (R. 79).

Ms. Andrak stated that Mr. Pelech is able to bring the laundry downstairs and carry groceries into the house, although only a little at a time (R. 79). She stated that Mr. Pelech mostly reads the newspaper, watches television, and "putzes" around in the garage (R. 79-80). She stated that he is able to dress and feed himself, although some tasks may be hard for him (R. 82). They go out a few times a week to visit family or eat out (*Id.*). She stated that since Mr. Pelech's second knee surgery, he has increased weakness in his leg and walks with a limp (R. 83). Ms. Andrak approximated that Mr. Pelech can walk or stand up for about 20 minutes before he needs to sit down for a little while (*Id.*). The amount of time he can stand up has decreased since his second surgery (R. 84).

8

Finally, VE Lee Knutsen testified. He testified that Mr. Pelech's past work as an iron worker was heavy, skilled work that Mr. Pelech can no longer perform (R. 86-87). The ALJ asked the VE whether there were sedentary jobs that Mr. Pelech could perform, taking into consideration limitations of lifting up to only ten pounds; standing or walking for two hours out of an eight-hour work day; only occasionally using the right upper extremity for pushing or pulling or operating foot controls; frequently using the upper right extremity for fingering and feeling; never climbing ladders/ropes/scaffolds; occasionally climbing ramps or stairs; occasionally balancing and stooping; and frequently kneeling and crawling (R. 86-87). The VE testified that given those restrictions, Mr. Pelech could perform sedentary, unskilled work as an assembler, inspector/checker/weigher, or an order clerk (R. 87-88). Changing the limitations to include only occasional use of the right, upper extremity in terms of fingering and feeling, the VE stated that this added limitation would render Mr. Pelech unemployable as it precludes most, if not all, work (R. 89).

**D.**

On March 25, 2013, the ALJ issued a 10-page, single-spaced written opinion finding Mr. Pelech not disabled pursuant to Sections 216(i) and 223(d) of the Social Security Act (R. 21-30). In evaluating Mr. Pelech's claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, he must assess and make a finding about the claimant's RFC before moving on to Step 4. *See* 20

9

C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to his past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ found that Mr. Pelech has not engaged in substantial gainful employment since his alleged onset date of August 5, 2010 through his date last insured of December 31, 2012 (R. 23). At Step 2, the ALJ found that Mr. Pelech had the following severe impairments through his date last insured: right knee fracture with arthritic residuals from fracture and surgeries; arthritis of the right ankle residual from surgery; asthma; and right fifth finger arthritis (*Id.*). At Step 3, the ALJ concluded that Mr. Pelech's severe impairments did not meet or equal any of the impairments listed in the Listing of Impairments (R. 24). The ALJ then determined that Mr. Pelech has the RFC to perform sedentary work but with certain limitations (R. 25).[3] At Step 4, the ALJ found that Mr. Pelech had no relevant past work history, so the ALJ proceeded to Step 5 and concluded that Mr. Pelech could perform the jobs of order clerk, assembler, and inspector/weigher/checker (R. 30). Accordingly, the ALJ found Mr. Pelech not disabled (*Id.*).

---

[3]These limitations are as follows: "He could lift up to 10 pounds occasionally . . . He could stand or walk for approximately 2 hours per 8 hour workday and sit for approximately 6 hours per 8 hour workday, with normal breaks. He was limited to occasional operation of foot controls with the right lower extremity. He could not climb ladders, ropes, or scaffolds. He could occasionally climb ramps or stairs. He was limited to occasional balancing and stooping and frequent kneeling and crawling. He was limited to frequent fingering and feeling with the right upper extremity. He could tolerate frequent exposure to environmental irritants such as fumes, odors, dusts, gases, poorly ventilated areas, and chemicals" (R. 25).

III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688, F.3d 306, 310 (7th Cir. 2012).

Mr. Pelech contends that the ALJ erred in four respects: (1) by failing to consider his borderline age situation and the application of a higher age category; (2) by attributing minimal weight to his treating physician, Dr. Timothy Brandt; (3) by improperly assessing his RFC; and (4) by improperly assessing his credibility. Because we find merit with respect to Mr. Pelech's first argument, we remand this case for further consideration.

A.

Mr. Pelech argues that the ALJ "made an improper mechanical application of the age categories by ignoring the fact that [he] was at a 'borderline' age" (Pl.'s Mem. at 11). This argument takes issue with the ALJ's use of the Medical-Vocational Guidelines, or "Grid," "which classif[y] a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience." *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005); 20 C.F.R. § 404.1560. Mr. Pelech—whose age was 49 years and 6 months old on his date

11

last insured, and 49 years and eight and one-half months old on the day the ALJ issued his opinion—maintains that the ALJ erred by failing to consider the application of a higher age category (age 50-54) (Pl.'s Mem. at 11-13; Pl.'s Reply at 1-5). The Commissioner argues in response that the ALJ correctly applied the Grid in determining that Mr. Pelech properly was placed in his chronological age group (under age 50) (Def.'s Mem. at 2-4). The Commissioner further points out that the Social Security Administration's Hearing, Appeals & Litigation Law Manual ("HALLEX") states that an ALJ "need not explain his or her use of the claimant's chronological age." HALLEX II–5–3–2 (S.S.A.), 2003 WL 25498826 (2003).

20 C.F.R. § 404.1563 instructs ALJs in the application of age categories. A claimant who is under the age of 50 years old is considered a "younger person" whose age will not seriously affect his or her ability to adjust to other work. 20 C.F.R. § 404.1563(c). By contrast, a person who is between the ages of 50 and 54 years old is considered to be "closely approaching advanced age," and this, along with other factors such as severe impairments and limited work experience, "may seriously affect [the claimant's] ability to adjust to other work." *Id.* at § 404.1563(d). Section 404.1563(b) discusses what to do in the event of a "borderline situation" -- meaning a situation in which a claimant is close to a different age category:

> How we apply the age categories. When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. *We will not apply the age categories mechanically in a borderline situation.* If you are within a *few days to a few months* of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will *consider whether to use* the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b) (emphasis added). Thus, Section 404.1563(b) indicates a two-part analysis in determining whether a "borderline situation" exists: (1) whether the claimant's age is

12

within a few days or months of a higher age category; and (2) whether using the higher age category would result in a finding of disability. *See also* Social Security Ruling ("SSR") 82–46c, 1982 WL 31427, at *6 (1982); HALLEX II–5–3–2. A borderline age situation exists where the answer to both questions is "yes," in which case the adjudicator must then decide whether it is more appropriate to use the claimant's chronological age or the older age category. HALLEX II-5-3-2.

Section 404.1563(b) does not define how many months short of 50 years old still is close enough to trigger a "borderline situation." However, ALJs are instructed to apply "the guidelines flexibly to avoid dramatic shifts in results." SSR 82-46(c) n. 4. Additionally, ALJs are advised to take a "sliding scale" approach where "the claimant must show progressively more additional vocational adversity(ies)—to support use of the higher age—as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens." HALLEX 11-5-3-2. Examples of "additional vocational adversities" are "the presence of an additional impairment(s) which infringes upon—without substantially narrowing—a claimant's remaining occupational base," such as having only marginal English skills, or having a history of unskilled work experience in an isolated industry. *Id.*

The Seventh Circuit has not expressed itself on the matter of boarderline age situations, but other Circuits have weighed in on the issue, with varying results. In *Phillips v. Astrue*, 671 F.3d 699, 703-07 (8th Cir. 2012), the Eighth Circuit concluded that a claimant who was four months shy of her 55th birthday and who demonstrated at least one additional vocational adversity (no past relevant work), presented a borderline case, and the ALJ's failure to consider the next age category required a remand. In *Daniels v. Apfel*, 154 F.3d 1129, 1133-36 (10th Cir. 1998), the Tenth Circuit remanded a case after the ALJ failed to consider whether a claimant fell

13

within a borderline age situation when he was only a little more than two months away from an older age category. But in *Lockwood v. Comm'r of Social Security Admin.*, 616 F.3d 1068, 1071-74 (9th Cir. 2010), the Ninth Circuit determined that the ALJ had satisfied the requirement to consider an older age category where she mentioned the claimant's date of birth and age category of "closely approaching advanced age," and included a citation to 20 CFR § 404.1563. Similarly, the Sixth Circuit in *Bowie v. Comm'r of Social Security*, 539 F.3d 395 (6th Cir. 2008), held that Section 404.1563(b) "does not impose on ALJs a *per se* procedural requirement to address borderline age categorization in every borderline case" and thus found no error with the ALJ's lack of explicit discussion of age in the case of a claimant who was less than two months shy of her 50th birthday. *Id.* at 400.

Numerous courts in this district have held that ALJs must explain their age category determinations in borderline situations. In *Figueroa v. Astrue*, 848 F. Supp. 2d 894, 896 (N.D. Ill. 2012), the court considered whether a claimant who was less than three months shy of his 50th birthday at the time of the ALJ's decision should have been put in the 50-54 age group category, which consequently would have meant he was disabled under the Grid. After a thorough examination of the existing caselaw in other jurisdictions and the relevant statutes and regulations, the court concluded that the claimant's close-approaching birthday meant that the ALJ should have considered placing him in the next age bracket. *Id.* at 902. In the absence of any discussion, there was no way for the reviewing court to tell whether the ALJ had done so, and this void required a remand. *Id.* Similarly, in *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, *11 (N.D. Ill., June 13, 2011), the court remanded where the ALJ failed to acknowledge that he considered the borderline-age issue in the case of a claimant who was a few months shy of age 50, noting: "[t]he ALJ must, at a minimum, acknowledge that he considered

14

the borderline-age issue non-mechanically, and doing so likely requires some explanation, however brief, of the conclusion he reached. Anything less makes judicial review impossible." *Id.* at *14. *See also Young v. Barnhart*, 287 F. Supp. 2d 905, 913 (N.D. Ill. 2003) (remand where claimant was four and one-half months short of falling into the next age category); *Graham v. Massanari*, No. 00 C 4669, 2001 WL 527326, *8 (N.D. Ill., May 9, 2001) (remand where "[t]here [wa]s no evidence or indication in the record that the ALJ ever considered the borderline regulation as applied to Plaintiff," who was four and one-half months away from turning age 50); *Freundt v. Massanari*, No. 00 C 4456, 2001 WL 1356146, *19 (N.D. Ill., Nov. 2, 2001) (remand required where ALJ made no reference to fact that claimant was "six months and 12 days" short of her 50th birthday but simply concluded claimant was a "younger individual).

In this case, Mr. Pelech was about six months away from his 50th birthday on his date last insured, and less than four months away from this milestone on the date the ALJ issued his decision. In that decision, the ALJ simply noted that Mr. Pelech was born on July 9, 1963, and that he was 49 years old on his date last insured, which placed him within the category of a "younger individual" (R. 29). The ALJ also cited to the relevant statute: 20 C.F.R. 404 § 1563. While under the Ninth Circuit's approach this may have been sufficient, we agree with the courts in this district, as well as the Eighth and Tenth Circuits, that more is required. The Seventh Circuit has long held that ALJ's must build a logical bridge between the evidence and their conclusions so as to permit meaningful review. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Here, the ALJ failed to build that logical bridge. We have no idea whether the ALJ considered Mr. Pelech's approaching 50th birthday as a borderline age situation, or whether he simply looked at Mr. Pelech's chronological age and applied the "younger individual" age group

15

in a mechanical fashion and without further thought. We do not know if he deemed Mr. Pelech's age to be insufficiently close to 50 years old to trigger the borderline situation analysis, and, if so, the basis for that decision. Nor do we know why, if he deemed this a borderline situation, the ALJ chose to use Mr. Pelech's chronological age despite the fact that if he moved Mr. Pelech to the next age category, Mr. Pelech's sedentary RFC would dictate a finding of disabled.[4]

We do not suggest that the ALJ must inevitably treat Mr. Pelech as a person within the 50-54 year old category. But, in the absence of any discussion on the topic, it is impossible to know whether the ALJ properly considered this matter.

## **CONCLUSION**

For the reasons set forth above, the Court grants Mr. Pelech's motion to reverse and remand the ALJ's decision (doc. # 11), and denies the Commissioner's motion to affirm the judgment (doc. # 18). The judgment of the Commissioner is reversed and the case remanded for

---

[4]The Commissioner protests that HALLEX specifically states that an ALJ "need not explain his or her use of the claimant's chronological age" (Def.'s Mem. at 4). The Plaintiff's rejoinder is that the SSA's Program Operations Manual System ("POMS") provides contrary guidance: "[w]hen a borderline age situation exists, you must explain your decision to use the next higher age category or your decision to use the claimant's chronological age and explain the specific factors supporting your determination" (Pl.'s Reply Mem. at 2); POMS DI 25015.005. Neither HALLEX nor POMS is binding on the Court. *See Figueroa,* 848 F. Supp. 2d at 901 n. 4 (noting that the Seventh Circuit has not ruled on whether HALLEX is binding on the Commissioner); *Parker v. Sullivan,* 891 F.2d 185, 190 (finding that "[t]he POMS manual has no legal force and therefore the standard cannot be controlling in this case"). That said, for the reasons we have given, we consider the approach set forth in POMS to be consistent with the Seventh Circuit's directive that ALJ's pave a logical path from the evidence to their determinations.

further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.[5]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: February 22, 2016

---

[5] In light of our ruling above, we need not address Mr. Pelech's remaining arguments. On remand, the ALJ shall consider not only Mr. Pelech's borderline age situation, but may also consider further the weight afforded to the opinion of Mr. Pelech's treating physician, Dr. Timothy Brandt; the extent of Mr. Pelech's RFC; and Mr. Pelech's credibility.